[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This is an appeal by the plaintiff International Data Operations, Inc., from a June 7, 2000 final decision of the human rights referee of the defendant, Commission on Human Rights and Opportunities ("CHRO"), finding discrimination against and entering remedial orders in favor of the defendant, Thomas Shulman. Shulman, as complainant before the CHRO, alleged that the plaintiff discriminated by failing to reasonably accommodate him at his place of employment and in discharging him in retaliation for his opposition to the plaintiff's discriminatory conduct in violation of General Statutes §§ 46a-58 (a), 46a-60a(1) and (4), Title VII of the Civil Rights Act of 1964, as amended, and the Americans with Disabilities Act ("ADA") of 1990, 42 U.S.C. § 12101 et seq.[1]
The plaintiff's appeal is authorized by General Statutes §§ 46a-94a
and 4-183 of the Uniform Administrative Procedure Act ("UAPA").
Shulman filed his complaint with the CHRO on July 18, 1996. (Return of Record ("ROR"), Volume I, Item 46, pp. 261-69.) The allegations of the complaint were investigated by the CHRO and on February 19, 1998, certified to a public hearing before a human rights referee. (ROR, Volume CT Page 9781 I, Item 45, p. 260.) The human rights referee made findings of fact which may be summarized as follows:
 1. Shulman is a wheelchair-bound paraplegic; his spinal chord was injured in an automobile accident.
 2. On February 22, 1996, Shulman was hired by Professional Help Desk ("PHD") after an interview conducted by its president and the director of customer support (Shulman's supervisor). Both officials of PHD were aware of Shulman's disability status.
 3. Shulman's position was that of technical support specialist. He was to take telephone calls from customers of PHD that had been previously contacted by outside salesmen for PHD.
 4. On Shulman's first day of work, he found that he could not fit his wheelchair into the men's bathroom without the readjustment of certain temporary partitions near the men's bathroom door.
 5. Shulman told his supervisor about his lack of access to the men's bathroom, who promised to look into the situation. The access problem was never remedied while Shulman was employed by PHD.
 6. Shulman's option in lieu of using the men's facilities at work was to drive to his home on his lunch hour, and then to return to work. To accomplish this took Shulman approximately forty-five minutes. His supervisor was aware of Shulman's leaving work at lunch hour for bathroom purposes.
 7. Shulman had no permanent desk, telephone or computer at PHD for five weeks.
 8. Once he was assigned a desk, Shulman found that he could not fit the wheelchair under the desk without disassembling it. He asked his supervisor to arrange to place blocks under the desk to raise it. CT Page 9782
 9. Since the desk was not raised, Shulman had a problem with his legs hitting up against the underside of the desk; also the angle of his keyboard at the unraised desk made typing more difficult for him.
 10. Shulman's basic assignment was to take telephone calls, as was the case with other employees in his unit. While another employee was provided with a telephone head set, Shulman was not so provided even though he did ask his supervisor for a set.
 11. Shulman also asked for a different parking space from the one assigned to him due to the fact that his van was blocking the entrance to the building. He was never assigned a different parking space.
 12. Shulman was never warned by his supervisor or the president of PDH that his performance at work was inadequate. He was shown no letters from dissatisfied customers.
 13. Two e-mail communications between Shulman's supervisor and the president were introduced by the plaintiff to show that Shulman had been directed to improve his telephone manner with customers. The e-mails were not dated or specific as to events showing Shulman's wrongful conduct. Shulman denied seeing the e-mails.
 14. Shulman was terminated by his supervisor on May 14, 1996, at the direction of the president of PHD on the ground that he was rude to customers on the telephone.
 15. Since termination, Shulman has tried to find a new position, but has been unsuccessful at finding full-time work, although he has held part-time jobs.
 16. PHD was sold to the plaintiff subsequent to his termination.[2]
 17. The president of PHD testified that he heard CT Page 9783 Shulman arguing with a customer and he counseled Shulman to avoid the tone that he had displayed in the telephone call. The president testified that he also spoke to Shulman about rudeness on the telephone five additional times.[3]
 18. The president was contradictory on why the bathroom repairs were not made and why the telephone head set was not purchased.
 19. The supervisor testified that he had been told by PHD salesmen that Shulman was rude to customers, but admitted on cross-examination that these salesmen did not give him specifics about Shulman. The cause of Shulman's unpleasant attitude on the telephone might have stemmed from PHD software design problems he was coping with.
 20. Shulman was qualified for his position. He performed his work without reasonable accommodation in pain and discomfort and with difficulty.
(ROR, Volume 1, Item 1, pp. 4-2 1.)
Based upon these findings, as summarized, the human rights referee concluded:
 1. The [plaintiff] fits the definition of covered employer under both the ADA and the Connecticut Fair Employment Practices Act.
 2. [Shulman] is a wheelchair bound paraplegic whose condition constitutes a disability pursuant to the Acts.
 3. [Shulman's] physical impairments affect the major life activities of walking and running under the Acts.
 4. [Shulman] is substantially limited in the major life activities of walking and running under the Acts.
 5. The [plaintiff] had notice of [Shulman's] disability because at all times during his CT Page 9784 employment, he needed a wheelchair to ambulate.
 6. [Shulman] possessed the educational background, job experience and other skills necessary to perform the job of Technical Support Specialist.
 7. [Shulman] requested four reasonable accommodations from the [plaintiff] in order to perform the essential function of his job:
• A telephone headset;
 • Four wooden blocks to place under the legs of his desk so that he could slide his wheelchair underneath the desk in order to use the telephone and computer;
 • Wheelchair accessibility to the men's room
• Assignment of a Handicapped parking space.
 8. The [plaintiff] did not meet its evidentiary burden of demonstrating that the accommodations requested by [Shulman] were unreasonable or that they would have imposed an undue hardship on the [plaintiff].
 9. The [plaintiff] did not engage in the interactive dialogue with [Shulman] about the reasonable accommodations he requested.
 10. The [plaintiff] caused the communications about reasonable accommodation to break down by not responding to [Shulman's] repeated requests for communication and information.
 11. The [plaintiff] failed to provide any of the reasonable accommodations [Shulman] requested.
 12. [Shulman] was a qualified individual who could perform the essential functions of his job, with or without reasonable accommodations, pursuant to the Acts.
 13. [Shulman] sustained [his] evidentiary burden of CT Page 9785 setting forth a prima facie case of retaliatory discharge under the Acts.
 14. [Shulman] proved by a preponderance of the evidence that the [plaintiff's] decision to fire him was fueled by a discriminatory animus because he exercised his rights under the Acts.
(ROR, Volume 1, Item 1, pp. 65-67.)
The human rights referee, having concluded that Shulman's rights had been violated, awarded him, among other things, back pay from the date of his termination to the date of the final decision, together with compounded prejudgment interest of 10 percent, less an amount in mitigation of damages. (ROR, Volume 1, Item 1, pp. 71-72.) The plaintiff has appealed from this final decision. Since the plaintiff is required to pay damages to Shulman and take other remedial steps under this decision, aggrievement is found.
The court reviews the plaintiff's claims on this appeal under the substantial evidence test. "Judicial review of an administrative agency decision requires a court to determine whether there is substantial evidence in the administrative record to support the agency's findings of basic fact and whether the conclusions drawn from those facts are reasonable. . . ." (Citation omitted; internal quotation marks omitted).Adriani v. Commission on Human Rights Opportunities, 220 Conn. 307,314-15 (1991).
 We begin our analysis by noting that our review of an agency's factual determination is constrained by the [UAPA]. Specifically, General Statutes § 4-183
(j)(5) mandates that a court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. The court shall affirm the decision of the agency unless the court finds that substantial rights of the person appealing have been prejudiced because the administrative findings, inferences, conclusions, or decisions are . . . clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record . . . We have interpreted the standard of review set forth in the act as limiting our review such that [w]ith regard to questions of fact, it is neither the function of the trial court nor of this court to retry the case or to substitute its judgment for that of the administrative agency. . . . This CT Page 9786 substantial evidence standard is highly deferential. . . .
(Citations omitted; internal quotation marks omitted.) Salmon v. Dept. ofPublic Health Addiction Services, 58 Conn. App. 642, 660-61, cert. granted on other grounds, 254 Conn. 926 (2000); Ames Dept. Stores, Inc.v. Commission on Human Rights Opportunities, 45 Conn. Sup. 276, 283
(1997), aff'd, 48 Conn. App. 561, cert. denied, 245 Conn. 924 (1998) (in applying the substantial evidence test, court defers to agency's decision on matters of proof).
As to the human rights referee's conclusions of law, "[t]he court's ultimate duty is only to decide whether, in light of the evidence, the [agency] has acted unreasonably, arbitrarily, illegally, or in abuse of its discretion. . . . Conclusions of law reached by the administrative agency must stand if the court determines that they resulted from a correct application of the law to the facts found and could reasonably and logically follow from such facts. . . ." (Citations omitted; internal quotation marks omitted.) Cadlerock Properties Joint Venture, L.P. v.Commissioner of Env. Protection, 253 Conn. 661, 669, cert. denied, ___ U.S. ___, 121 S.Ct. 1089, 148 L.Ed.2d 963 (2001).
Shulman's complaint to the CHRO had two separate elements to it — an alleged failure of the plaintiff to accommodate him, and an alleged illegal termination for asserting his rights, a disparate treatment claim. "Disparate treatment claims are analyzed somewhat differently than failure to accommodate claims." Weigel v. TargetStores, 122 F.3d 461, 464 (7th Cir. 1997). The court will endeavor to discuss the plaintiff's issues in this administrative appeal with Shulman's two track approach in mind.
In assessing Shulman's claim that he was wrongly terminated for pursuing his rights under the ADA, 42 U.S.C. § 12203 (a),[4] the human rights referee made use of the burden-shifting rules applicable to Title VII and the ADA. (ROR, Volume 1, Item 1, p. 45, citing Sarno v.Douglas Elliman-Gibbons Ives, Inc., 183 F.3d 155, 159 (2d Cir. 1999).) According to the human rights referee, Shulman had to establish a prima facie case of discrimination by a preponderance of the evidence. Once Shulman met that burden, the plaintiff-employer had to articulate a nondiscriminatory reason for its action. The burden would then shift to Shulman to establish that the employer's reason was a pretext. (ROR, Volume 1, Item 1, p. 47, citing Fisher v. Vassar College, 114 F.3d 1332,1333 (2d Cir. 1997), cert. denied, 522 U.S. 1075, 118 S.Ct. 851,139 L.Ed.2d 752 (1998).)
The plaintiff's first claim to the court is that in applying the rules stated above, the human rights referee made an evidentiary error. At the CT Page 9787 hearing, the plaintiff proffered that the nondiscriminatory reason for its discharge of Shulman was that he was rude to customers. With Shulman as a witness, the plaintiff's attorney asked him whether he remembered participating in a fact-finding hearing during the CHRO's investigation of Shulman's complaint. Then the following ensued:
 Human Rights Referee Trojanowski: Now, is this at the — I'm going to ask counsel whether this is at the investigative stage of the proceedings?
Mr. Miller [plaintiff's counsel]: Yes.
Human Rights Referee Trojanowski: of this proceeding?
Mr. Miller: Yes.
 Human Rights Referee Trojanowski: I have to warn counsel that this is a hearing de novo, and what that means in terms of the record on the investigative stage is that we don't admit any evidence of the record at the investigative stage. So none of the documents are before me, and I won't allow any questions as it relates to what happens at the investigative stage.
(ROR, Volume 2, Item 47, p. 320.)
The human rights referee thus ruled that the plaintiff could not cross-examine Shulman by playing for him a portion of the tape of the fact-finding session, where Shulman allegedly admitted rudeness. (ROR, Volume 2, Item 47, p. 321.) The plaintiff's counsel was permitted by the human rights referee to ask Shulman whether he was "short tempered" with a customer, whether he ever described himself as being "short tempered" with a customer while at PHD, and whether Shulman's supervisor lost his temper while reprimanding him. (ROR, Volume 2, Item 47, pp. 322, 327.)
In the present appeal, the plaintiff argues that the human rights referee, in enforcing the rule that the investigative stage was irrelevant, erred in excluding the tape recording and eliminating the plaintiff's opportunity to impeach Shulman on its central rudeness claim. The CHRO replies that the error, if any, by the human rights referee was harmless.
Our Supreme Court has applied the "harmless error" principle to evidentiary rulings at CHRO hearings. See Levy v. Commission on HumanRights Opportunities, 236 Conn. 96, 111 (1996). In Ann Howard'sCT Page 9788Apricots Restaurant, Inc. v. CHRO, 237 Conn. 209 (1996), a hearing rights referee had allowed the direct testimony of the complainant, who had died before cross-examination was completed. The respondent-plaintiff appealed on the ground that it was denied full cross-examination. The Supreme Court made use of the harmless error rule:
 We have previously concluded that harmless error analysis is available in the administrative context. The Uniform Administrative Procedure Act provides that if an individual's substantial rights have been prejudiced, the case should be remanded unless but one conclusion is required by law. . . . Therefore, because there was significant evidence in the record, apart from Doe's testimony, from which the hearing officer could have concluded that the plaintiff had impermissibly discriminated against Doe, the hearing officer's failure to exclude that testimony was harmless and we need not decide whether the hearing officer abused her discretion.
(Brackets omitted; citations omitted; internal quotation marks omitted.) Id., 227-28.
The court agrees with the CHRO that the exclusion of the evidence was harmless. Other than the inquiry about the tape, the plaintiff was not restricted in its cross-examination of Shulman and thoroughly explored Shulman's possible rudeness as well as his prior statements on his attitude toward customers. (ROR, Volume 2, Item 47, p. 322.) Shulman's denials of rudeness were in the record. (ROR, Volume 2, Item 47, p. 322.)
In addition, the human rights referee, in rejecting the plaintiff's rudeness justification and finding pretext, made use of the supervisor's testimony that he had not observed Shulman being rude to any customer, the lack of any documentation in Shulman's personnel file about warnings, the fact that Shulman's testimony was consistent with the documentary evidence, and his conclusion that the president's testimony was inconsistent and lacked credibility. (ROR, Volume 1, Item 1, pp. 48, 61, 65.) Therefore, the exclusion of the additional evidence of whatever was stated by Shulman on the tape during the fact-finding session was harmless. Its introduction would not have been sufficiently significant to alter the conclusion of the human rights referee.
The plaintiff's next point is that the human rights referee did not properly analyze whether Shulman needed an accommodation at the work place. This claim is based upon the reasonable accommodation provisions of CT Page 9789 the ADA and not the retaliatory discharge provisions. See Bultemeyer v.Fort Wayne Community Schools, 100 F.3d 1281, 1283 (7th Cir. 1996). Shulman had to demonstrate that he was "otherwise qualified" for his assigned job. He had the burden of proving that he could meet the requirements of the job with or without an accommodation. Borkowski v.Valley Cent. School Dist., 63 F.3d 131, 137 (2d Cir. 1995).
The human rights referee found that Shulman was qualified for the position for which he was employed based on his education and prior work experience in the data processing field. (ROR, Volume 1, Item 1, p. 34.) The plaintiff argues, however, that because Shulman testified that it was not impossible, only physically uncomfortable, to undertake his job without his suggested accommodations, (ROR, Volume 2, Item 47, p. 311), the human rights referee erred in finding that accommodations were necessary.
The plaintiff errs in merging two concepts together. Shulman proved to the satisfaction of the human rights referee that he could perform the essential functions of his job without accommodation. (ROR, Volume 1, Item 1, pp. 9, 66.) The burden then becomes the plaintiffs to show that "the proposed accommodation would cause it to suffer an undue hardship. . . . [M]eeting the burden of nonpersuasion on the reasonableness of the accommodation and demonstrating that the accommodation imposes an undue hardship amount to the same thing. . . ." (Citations omitted.) Borkowski v. Valley Cent. SchoolDist., supra, 63 F.3d 138.
This is not a situation where the sought-after accommodations were mere conveniences. Weber v. Strippit, Inc., 186 F.3d 907 (8th Cir. 1999), cert denied, 528 U.S. 1078, 120 S.Ct. 794, 145 L.Ed.2d 670 (2000); 5 J. Cook J. Sobieski, Civil Rights Actions (2001) p. 22A-142, § 22A.08 (D). Shulman was not seeking assistance in remedying a correctable impairment. Sutton v. United Air Lines, Inc., 527 U.S. 471,119 S.Ct. 2139,144 L.Ed.2d 450, 465 (1999). The record supports the conclusion of the human rights referee that Shulman had established his prima facie case by, among other things, showing that he could accomplish the essential functions of his position and that the burden of persuasion had passed to the plaintiff. (ROR, Volume 1, No. 1, pp. 34-35, 66.)
The plaintiff next argues that it did not have to take special steps to provide accommodations to Shulman, more than any other employee, and thus that the human rights referee overreached in his conclusions. The facts as found by the human rights referee rebut this claim. He found that the plaintiff had failed to grant Shulman's reasonable requests for accommodations necessary for him to perform his job. (ROR, Volume 1, Item 1, p. 66); Borkowski v. Valley Cent. School Dist., supra, 63 F.3d 138. He CT Page 9790 further found that the plaintiff never supplied any accommodation or proved that the sought after accommodations constituted undue hardship,42 U.S.C. § 12112 (a), and that the plaintiff's witnesses were not credible. (ROR, Volume 1, Item 1, pp. 32-33, 38.) The human rights referee's order did not impose "affirmative action" on the plaintiff as was the case in Daugherty v. City of El Paso, 56 F.3d 695, 700 (5th
Cir. 1995), cert. denied, 516 U.S. 1172, 116 S.Ct. 1263, 134 L.Ed.2d 211
(1996).
The plaintiff correctly relies upon Gile v. United Air Lines, Inc.,95 F.3d 492, 499 (7th Cir. 1996) and Ezikovich v. Commission on HumanRights Opportunities, 57 Conn. App. 767, cert. denied, 253 Conn. 925
(2000) to contend that the employer is not required to provide a particular accommodation to an employee or one which the employee prefers. The employer must provide a reasonable accommodation. The plaintiff states that Shulman was seeking specific accommodations, while it was offering reasonable alternatives. The record does not support this contention. Suggesting that Shulman remove the wheels from his chair in order to be seated comfortably at his desk, or that he leave work to use the toilet facilities was, as the human rights referee found, (ROR, Volume 1, Item 1, p. 37), no accommodation at all. No other employee had to take the steps that Shulman did to perform his job at this workplace.
According to the human rights referee, the plaintiff did not fairly proceed with an interactive dialogue on the necessary accommodations. (ROR, Volume 1, Item 1, p. 66, ¶ 9); Beck v. University of Wisconsin Bd.of Regents, 75 F.3d 1130, 1137 (7th Cir. 1996). Therefore, the court concludes that the human rights referee made a correct finding that Shulman was not unfairly seeking only specific accommodations.
The factual findings of the human rights referee also rebut the plaintiff's claim that it had started to take steps to make the renovation to the men's bathroom. (Brief of Plaintiff International Data Operations, Inc., p. 21 n. 7.) The hearing rights referee found that these repairs were authorized after Shulman was terminated. (ROR, Volume 1, Item I, p. 15, ¶ 106.) The court agrees with the conclusion of the human rights referee that the plaintiff was obliged to make the changes to the facilities. (ROR, Volume I, Item 1, p. 29, citing Worthington v.City of New Haven, United States District Court, Docket No. 3:94-CV-00609 (D.Conn. October 5, 1999)); 29 C.F.R. § 1630.2 (o).
The plaintiff contends further that since both the president and supervisor interviewed Shulman and then decided to hire him, a presumption arises that his subsequent firing by these individuals was not discriminatory. Grady v. Affiliated Cent., Inc., 130 F.3d 553, 560 (2d Cir. 1997), cert. denied, 525 U.S. 936, 119 S.Ct. 349, 142 L.Ed.2d 288
CT Page 9791 (1998). The problem with this argument is that the human rights referee found that the two officials of the plaintiff lacked credibility. (ROR, Volume 1, No. 1, pp. 48, 49-57.) Since there is substantial evidence to support this conclusion, the human rights referee cannot be reversed for failing to observe the presumption.
The plaintiff's final points relate to damages. It first claims that the human rights referee erred in awarding Shulman back pay from the date of his termination to the date of the CHRO final decision (June 7, 2000). The plaintiff sets April 10, 1998 as the cut off date for back pay, based upon its reading of the record.
The record is confusing on this point. There is a letter from the plaintiff's counsel to an attorney for the CHRO indicating that the PHD division of the plaintiff had been sold on April 10, 1998. (ROR, Volume 1, Item 13, pp. 156-57.)[5] There is also the testimony of the president of PHD that he was the moving force behind the sale of PHD to Computer Associates and that he had left his job after the sale, a year and one half before the hearing date of November, 1999. (ROR, Volume 2, Item 47, p. 349.) The human rights referee, however, made the finding that PHD "was eventually sold to" the plaintiff. (ROR, Volume 1, Item 1, p. 10, ¶ 56.) He further found that PHD "had a reporting relationship" with the plaintiff. (ROR, Volume 1, Item 1, p. 13, ¶ 91.)
The human rights referee thus did not resolve for what period of time PHD was a subdivision of the plaintiff or at what point the plaintiff sold the assets to the wholly separate company, Computer Associates. Nor is there evidence in the record of whether there was a full layoff of PHD staff or whether severance packages or transfers were offered by the plaintiff after the sale to Computer Associates. It was, however, the duty of the plaintiff to develop the evidence of record so that the hearing officer could appropriately calculate the back pay figure. Cohen v. WestHaven Bd. of Police Com'rs, 638 F.2d 496, 502 (2d Cir. 1980); E.E.O.C.v. Joint Apprenticeship Committee, 186 F.3d 110, 122 (2d Cir. 1999) (uncertainties in back pay are resolved against the employer as it created the discriminatory practice).
Since the plaintiff did not meet its evidentiary burden, the court must approve the findings of the human rights referee establishing the back pay period. Dacey v. Commission on Human Rights Opportunities, Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. 523991 (May 13, 1994, Maloney, J.), appeal dismissed, 41 Conn. App. 1
(1996).
The human rights referee carefully calculated the appropriate damages and allowed for prejudgment interest. (ROR, Volume 1, Item 1, pp. 69-70.) CT Page 9792 The plaintiff contests the prejudgment interest award. The case law supports the decision of the human rights referee. Saulpaugh v. MonroeCommunity Hosp., 4 F.3d 134, 145 (2d Cir. 1993), cert. denied,510 U.S. 1164, 114 S.Ct. 1189, 127 L.Ed.2d 539 (1994).
The court affirms the final decision of the CHRO and dismisses the plaintiff's appeal.
Henry S. Cohn, Judge